UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JERMELL McCLEAN,

                                          Plaintiff,

   v.
                                                                   9:19-CV-1227

DARWIN LaCLAIR, Superintendent of               (LEK/ATB)
Franklin Correctional Facility, et al.,

                                          Defendants.

---

JERMELL McCLEAN, Plaintiff, pro se
LAUREN R. EVERSLEY, Asst. Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge. Presently before the court is a combined motion for summary judgment and motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 56 and 12(b)(6) respectively. (Dkt. No. 17). Plaintiff has responded in opposition to the motion for summary judgment, and defendants have filed a reply. (Dkt. Nos. 20, 21). For the following reasons, this court agrees with defendants and will recommend dismissal of the first amended complaint.

**I.   Facts**

In his first[1] amended complaint ("FAC"), plaintiff alleges that, on the morning of July 29, 2019, while he was an inmate at Franklin Correctional Facility ("Franklin"), he was taken to Alice Hyde Hospital for surgery to repair his anterior cruciate ligament ("ACL"). (FAC ¶¶ 8-10) (Dkt. No. 9). Plaintiff was transported to the hospital by

---

[1] Plaintiff refers to this document as his "First Amended Complaint ("FAC"); thus, the court will do the same.

defendant corrections officers Theodore Harris and Todd Raymond. (FAC ¶ 11). Plaintiff alleges that defendants Harris and Raymond stayed with him the entire day and were present after the surgery, when hospital staff gave plaintiff specific instructions to refrain from putting any weight on his leg "to allow the surgical adhesive time to cure and to allow the ligament to knit back together." (FAC ¶ 12).

Plaintiff claims that the "hospital staff" attempted to give plaintiff a pair of crutches, but were told by defendants Harris and Raymond that, according to the "Superintendent's policy," inmates were not allowed to have metal crutches, but defendants assured the staff that "he would be given a pair of crutches which were permitted" when they got back to the facility. (FAC ¶ 13). Plaintiff states that he and defendants Harris and Raymond left the hospital at 3:35 p.m. and arrived back at the facility at 3:55 p.m. (FAC ¶ 14).

Plaintiff alleges that, during the ride back to Franklin, he overheard the defendants complaining about defendant LaClair's "overtime policies," and were angry that they might have to wait until the "count cleared" before they could enter the facility with the plaintiff. (FAC ¶ 15). Plaintiff states that defendant Harris complained that since the "trip" was "officially over" when they arrived at the facility, the defendants could be "stuck" for another hour or more while they waited for the count to clear, but would not receive overtime pay. (FAC ¶ 16). Defendant Raymond allegedly stated that they would have to get plaintiff "to medical fast so we can get the hell out of here," and Harris agreed that he was not going to stay any longer if he was not getting paid for it. (FAC ¶ 11).

Plaintiff states that, upon their arrival, they had to wait 15 to 20 minutes for the

2

facility count to clear before they could enter the facility properly. (FAC ¶ 18). Plaintiff states that under "normal circumstances," the transportation van would enter the facility through the "Truck-Trap," and would stop directly in front of the prison medical unit, which was plaintiff's ultimate destination that day. (FAC ¶ 23). However, plaintiff states that "[f]or reasons unknown to the plaintiff, the defendants were unable to enter [Franklin] through the Truck-Trap." (FAC ¶ 21).

Plaintiff claims that "guided by defendant Superintendent's fiscal policy" regarding overtime pay, and because they did not want to wait until they could enter through the Truck-Trap, the defendants parked the transport van in the front parking lot and forced plaintiff to walk on his left leg, without the use of any assistive device. (FAC ¶ 24). Plaintiff states that this required plaintiff to walk through the Administration Building to a holding area that was from 500 to 1000 feet from where the defendants parked the van. (*Id.*)

Plaintiff states that he tried to protest about being forced to walk on his "recently repaired" leg, contrary to the instructions of the hospital staff. (FAC ¶ 25). Plaintiff claims that defendant Raymond said: "'come on, you can make it with my help,'" and that defendant Harris stated that this was a "'direct order.'" (*Id.*) Plaintiff alleges that, even though defendant Raymond offered to help him, he did not "brace" plaintiff to prevent him from bearing weight on his left leg, instead, he merely "'guided'" plaintiff's arm. (FAC ¶ 26). Plaintiff claims that due to his mechanical restraints, the defendants would have been unable to properly assist plaintiff. (FAC ¶ 27).

Plaintiff claims that he was forced to walk the entire length of the Administration Building, and that he felt something "snap," which caused him intense pain shooting up

3

his hip and down his foot. (FAC ¶¶ 28, 30). Plaintiff claims that he was brought to a metal bench, and a third corrections officer, asked the defendants where they were coming from. (FAC ¶ 28). The "non-party" corrections officer told defendants that they could not make the plaintiff walk and called for a wheelchair. (*Id.*) Plaintiff was taken the rest of the way to the infirmary by wheelchair. (*Id.*)

Plaintiff states that, at the infirmary, he was evaluated by the "medical staff," and placed in a room overnight. (FAC ¶ 31). The next morning, plaintiff saw the facility doctor, who was told that plaintiff was forced to walk on the injured leg. (*Id.*) Plaintiff claims that the doctor was concerned that the "surgical adhesive used in the procedure might have separated" or the "repair had re-torn." However, his "proposed course of action" was to see whether plaintiff's functionality improved with healing time and physical therapy. (*Id.*) Plaintiff claims that, since that time, he has suffered constant pain and burning sensation in the knee. He also has trouble sleeping, standing, walking, and performing everyday tasks. (FAC ¶ 32).

**II.     Motion to Dismiss**

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court's consideration is limited to the factual allegations as stated in the complaint, documents

4

attached to the complaint as exhibits or incorporated into the complaint by reference, and matters of which the court can take judicial notice. *Portillo v. Webb*, No. 16 Civ. 4731 (VEC/GWG), 2017 WL 4570374, at *1 (S.D.N.Y. Oct. 11, 2017) (quoting *Brass v. Am. Film Tech.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)). A court may take judicial notice of a public record pursuant to Fed. R. Evid. 201(b). *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

### III. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## IV.     Exhaustion of Administrative Remedies

### A.     Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), abrogated on other grounds by *Ross v. Blake,* 380 F. 3d. 670 (2004)  (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id*. § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's

failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2.

### B.     Application

Defendants argue that plaintiff has failed to exhaust his administrative remedies. In support of their motion for summary judgment on this issue, defendants have filed the declarations of Judy Tavernier, the IGP Coordinator at Franklin and Rachael Seguin, the Assistant Director of the IGP for the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. Nos. 17-3 ("Tavernier Decl.) and 17-4 ("Seguin Decl.")). Defendants argue that plaintiff has never filed any grievance at all with respect to the incident of which he complains in this case. IGP Coordinator Tavernier states that her office has, on file, all of the grievances filed at Franklin between January 1, 2016 until the present.[2] (Tavernier Decl. ¶ 10). IGP Coordinator

---

[2] The Franklin grievance office maintains all of the grievances and related documents for the current year and for the previous four calendar years. (Tavernier Decl. ¶ 10).

Tavernier declares that a search of the documents maintained in her office shows that plaintiff never filed a grievance relative to the incident in question, and in fact, did not file any grievances at all in 2019. (Tavernier Decl. ¶ 15).

IGP Assistant Director Seguin states that she is the custodian of the records maintained by the CORC. (Seguin Decl. ¶ 3). Her office also maintains the records of grievance appeals for the current year and for the four previous calendar years. (Seguin Decl. ¶ 8). IGP Assistant Director Seguin searched the documents maintained by her office and determined that plaintiff has never filed a grievance appeal with the CORC. (Seguin Decl. ¶ 12 & Ex. A). Exhibit A of IGP Assistant Director Seguin's declaration is a computer print out from the CORC database, dated June 4, 2020, which shows ***no appeals*** to the CORC filed by this plaintiff. (Seguin Decl. Ex. A). Thus, according to DOCCS records, plaintiff has failed to exhaust his administrative remedies. However, the court's inquiry must continue in order to determine whether such remedies were "available" to the inmate, given the plaintiff's allegations and response to defendants' motion.

The first amended complaint contains a lengthy discussion of plaintiff's alleged attempts to file grievances and appeals regarding the incident in question. (FAC ¶¶ 35-42). Plaintiff states that on July 29, 2019, the same day of the incident in question, and while he was in the infirmary, he wrote a grievance on plain paper because he did not have a grievance form. (FAC ¶ 35). Plaintiff states that he placed the grievance in an envelope, addressed it to the IGP Supervisor, sealed the envelope, and gave it to a corrections officer to place in the mail because there is no mail box or "grievance box" in the infirmary. (*Id.*) Plaintiff states that he wrote the grievance "quickly" because he

did not know how many days he would be in the infirmary. (*Id.*) In the FAC, he states that he kept a copy of the grievance, and he has submitted it as an exhibit to his opposition papers. (FAC ¶ 36 & Dkt. No. 20, Ex. A).

Plaintiff states that he received no response to this grievance. (FAC ¶ 36). Plaintiff states that, on August 14, 2019, he mailed a letter to the IGP Supervisor, along with a copy of the grievance, explaining that he had not received a response, and he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." (FAC ¶ 37). Plaintiff has attached a copy of this letter to his opposition papers. (Dkt. No. 20, Ex. B).

Plaintiff claims that he received no response to his August 14, 2019 letter. (FAC ¶ 38). As a result, plaintiff states that he wrote another letter to the IGP Supervisor at Franklin, dated September 3, 2019. (FAC ¶ 38). Plaintiff states that he attached another copy of the July 29, 2019 grievance to the September 3rd letter. (*Id.*) Plaintiff claims that in the September 3rd letter, he "explain[ed] that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." (*Id.*) Plaintiff has not included a copy of this letter in his opposition papers.

Plaintiff then states that he did not receive a response to the September 3rd letter. (FAC ¶ 39). He claims that on September 27, 2019, he had one of his family members contact the CORC in Albany. (*Id.*) Plaintiff states that his "family member" spoke to "a Ms. Mary Furcinetti (phonetic)," who was "very nice," and who "looked in the computer," and verified that no grievance, written by plaintiff, had been filed "by the IGP Supervisor," nor was it ever forwarded to the CORC. (FAC ¶ 40). Plaintiff states

10

that he followed all the appropriate steps, and that the IGP Supervisor's failure or refusal to "file and process" his grievances "and/or appeals" renders the administrative remedy process "unavailable." (FAC ¶ 41).

In *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016), the court quoted *Ross*, stating that "[a]n administrative procedure is unavailable when: (1) 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) it is 'so opaque that is becomes, practically speaking, incapable of use'; or (3) 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id*. (quoting *Ross*, 136 S. Ct. at 1859-60). The court must first point out that, based on the extensive discussion in his first amended complaint, plaintiff was clearly aware of the grievance process and knew how to use it at the time of the incident.

In *Williams v. Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016), the court found that the administrative remedy was unavailable to the plaintiff because the regulatory scheme governing Williams's situation was " 'so opaque' " and "'so confusing that . . . no reasonable prisoner can use [it].'" *Id*. at 124 (quoting *Ross*, 136 S. St. at 1859 (alterations in original)). In *Williams* plaintiff was in disciplinary housing, he gave his grievance to an officer to file, but the grievance was never filed, and Williams was transferred out of the facility shortly thereafter. *Id*. *Williams* was decided in the context of a motion to dismiss, and, the court accepted as true that the officer never filed the grievance and held that the regulations did not adequately outline the process for appeal in that situation because "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed," not those whose time limits never began to run

11

because the textual provisions allowing an inmate who does not receive a response to his grievance to appeal to the "next step" would never have "come into effect." 829 F.3d at 121.

*Williams* has been distinguished in cases in which the plaintiff was not segregated from the population and was able to have access to the grievance sergeant. *Davis v. Grant*, No. 15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019). In *Davis*, the court found that "[p]laintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement." *Id.* An "unsupported assertion" that plaintiff filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Id.* (citations omitted). *See also Engles v. Jones*, No. 6:13-CV-6461, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." (quotation omitted)); *Mims v. Yehl*, No. 13-CV-6405, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers . . . fails to excuse [the] inmate from fully grieving remedies[.]" (citation omitted)).

In this case, the fact that plaintiff has provided copies of some of the documents, allegedly relating to his grievance does not change the court's finding. *See Means v. Olmstead*, No. 9:17-CV-746 (BKS/ATB), 2019 WL 4395289, at *7 (N.D.N.Y. June 3, 2019), *Report-Recommendation adopted*, 2019 WL 3451127, at *2 (N.D.N.Y. July 31, 2019). In adopting my recommendation in *Means*, United States District Court Judge Brenda K. Sannes stated that plaintiff's submission to the court of the grievance that he allegedly filed "is insufficient here to warrant an exception to the exhaustion requirement." *Id.*

This case is similar to *Davis* and the cases cited therein. The case comes to the court on a motion for summary judgment. Although plaintiff was in the infirmary when he allegedly gave his original grievance to an officer, by the time he states that he realized that his grievance was unanswered, he was discharged from the infirmary and states that he mailed the August 14, 2019 letter himself. (FAC ¶ 37). He was not hampered by disciplinary confinement nor by subsequent transfer as was the plaintiff in *Williams*. Plaintiff was clearly aware that he could seek to "appeal" an unanswered grievance because he so stated in the letters that he allegedly sent to the IGP Supervisor. In his first amended complaint, plaintiff also states that he sent a family member to inquire about the grievance, and that person was told that no grievance had been filed. Finally, although plaintiff states that he filed a grievance and two follow-up letters to the IGP Supervisor, plaintiff has submitted only one of those letters to the court in his opposition papers.[3] Thus, the court cannot find that the grievance process in plaintiff's

---

[3] In her sworn declaration, IGP Supervisor Tavernier states that no such letters were received from the plaintiff in her office. (Tavernier Decl. ¶ 16).

13

case was "opaque." Plaintiff had every opportunity to use it.

In his opposition papers, plaintiff states that it was "the machinations of prison officials, which thwarted his access to, and the availability of the administrative grievance process." (Dkt. No. 20 at 3). He does not claim that the grievance process was opaque, rather he is attempting to use the third category of unavailability described in *Ross*. However, his claim of the "machinations" of unknown prison officials' is totally unsupported. He claims that he gave a grievance to a guard in the infirmary, but it was never filed, and that the IGP Supervisor failed to respond to two of his letters claiming that he did not receive a response to his grievance. There is no claim that plaintiff was misled or misinformed about the procedures, and he has cited no reason that anyone would have tampered with his grievance or his alleged letters. Thus, plaintiff has failed to exhaust his administrative remedies.[4] *See also Means v. Olmstead*, No. 9:17-CV-746 (BKS/ATB), 2019 WL 4395289, at *7 (N.D.N.Y. June 3, 2019), *Report-Recommendation adopted*, 2019 WL 3451127, at *2 (N.D.N.Y. July 31, 2019).

Generally, a dismissal for failure to exhaust administrative remedies is without prejudice. *Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009). However,

---

[4] Defendants also argue that, even assuming that plaintiff's claim that he wrote a letter to the IGP Supervisor advising that he had no response from the Superintendent and was "appealing" to the CORC is true, plaintiff did not wait thirty days before filing his federal action. Plaintiff states that he wrote his "letter" on September 3, 2013. Even assuming that the CORC received the letter the same day, it had thirty days to respond to plaintiff's "appeal." Plaintiff signed his original complaint on October 1, 2019, less that thirty days after plaintiff allegedly sent his letter. Defendant argues that, by failing to wait 30 days after the CORC allegedly received the appeal, plaintiff failed to exhaust his administrative remedies, even assuming that everything plaintiff says about the appeal process is true. If plaintiff did not wait the appropriate amount of time for an appeal by the CORC to be decided, this would be another reason that plaintiff's remedies were not exhausted. However, the court need not make this determination and declines to do so because plaintiff has not submitted a copy of the alleged letter, and the court is unwilling to speculate as to its existence and when it was or was not mailed.

when the plaintiff is unable to exhaust his remedies because of the expiration of the time to do so, the complaint should be dismissed with prejudice. *See Carlton v. Annucci*, No. 9:17-CV-245, 2019 WL 422530, at *2 (N.D.N.Y. Feb. 4, 2019) (dismissing with prejudice when the failure to exhaust was incurable because it was past the deadline for bringing such a grievance through the internal grievance program). Plaintiff's time to administratively appeal this action has passed. Thus, the court will recommend dismissing the action with prejudice.

## V. Personal Involvement

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v.*

15

*Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058 (GLS/ATB), 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B.   Application

In this case, plaintiff has included Franklin's Superintendent Darwin LaClair as a defendant. Defendant LaClair did not have any involvement in plaintiff's transport to or from the hospital on July 29, 2019. Plaintiff claims that defendant LaClair is personally involved in the constitutional violation because of his "overtime policies." Plaintiff states that defendants Harris and Raymond were complaining that they would not get paid overtime if they took too long to bring plaintiff back. So, plaintiff believes that in their haste to finish work, they did not bring plaintiff back to the facility properly, and as a result, made him walk on his injured leg.

16

Plaintiff has not stated personal involvement based on a "policy or custom" of the Superintendent, nor has he stated any other basis for defendant LaClair's personal involvement in the alleged constitutional violation.[5] First, plaintiff's assumption based on allegedly "overhearing" a conversation between the defendants – that there was a "policy" preventing them from getting overtime under the circumstances or that this "policy" was established by the Superintendent of the facility – is conclusory at best. Even less plausible is the plaintiff's assumption that the "overtime policy" caused the defendant officers to park too far away from the infirmary or that it caused them to insist that plaintiff walk on his injured leg.[6]

Plaintiff does not claim that defendant LaClair was actually involved in the incident, and he could not have "remedied" the situation after hearing about it through a report or appeal because the incident was over before defendant LaClair could have been informed about it.[7] Plaintiff also states that this incident occurred as a direct result of defendant LaClair's failure to train or supervise these officers, as evidenced "by the fact that over 150 similar grievances have been filed against the very same officers and

---

[5] The court notes that although plaintiff opposed the defendants' motion relative to exhaustion, he did not respond to the defendants' argument that defendant LaClair lacked personal involvement in the alleged constitutional violation. However, the court understands that the defendants' motion with respect to defendant LaClair was based on failure to state a claim; thus, plaintiff was not required to respond.

[6] The court notes that plaintiff's original complaint stated only that for "reasons unknown to [him]," the defendants could not drive plaintiff through the gates. (Complaint ("Compl.") at CM/ECF p.5) (Dkt. No. 1). There was no mention of overhearing any discussion between the guards or overtime policies in the original complaint. While the court understands that an amended complaint may add or clarify the claims in the original complaint, it would be unusual that no part of the detailed discussion of "overtime policy" would have been included in the original complaint or that, subsequent to Judge Kahn's order, plaintiff remembered the conversation that he "overheard" in such detail.

[7] Plaintiff does not claim that defendant LaClair was ever actually informed of the incident.

other transportation unit officers, and appealed to and denied by the Superintendent." (FAC ¶ 46). "A mere conclusory assertion that a supervisory defendant 'failed to train and supervise subordinates is insufficient to establish personal involvement, absent some factual connection between his failure to train and the harm that eventually befell [the] [p]laintiff.'" *Vasquez v. Yadali*, No. 16-CV-895 (NSR), 2020 WL 1082786, at *11 (S.D.N.Y. May 5, 2020) (quoting *Gantt v. Ferrara*, No. 15-CV-7661 (KMK), 2018 WL 4636991, at *6 (S.D.N.Y. Sept. 27, 2018) (dismissing claims for failure to train where complaint did not allege that defendant was "present for, let alone participated directly in, the alleged assault" and instead merely contended that defendant "encouraged misconduct . . . by not enforcing his policies and customs" and by failing to train his employees) (and citing *White v. Fischer*, No. 9:09-CV-204 (DNH/GHL), 2010 WL 624081, at *6 (N.D.N.Y. Feb. 18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability.").

In this case, aside from the vague nature of plaintiff's statement that defendant LaClair failed to train or supervise the defendant officers, he alleges that this information about the multiple grievances came to him from "conversations" that he had with present and former IGRC clerks. Even assuming that plaintiff did have these "conversations," there is no indication what the claims against the transportation officers might have been or that they were in any way related to the "overtime policy" which is why plaintiff states that the defendants engaged in the unconstitutional conduct. In addition, the fact that plaintiff claims that he was told that the grievance appeals were

denied by defendant LaClair does not indicate that the grievances were meritorious or that defendant was aware of the risk of such a constitutional violation occurring based on these alleged grievances. Aside from the "overtime" policy, there is also no evidence that the Superintendent would be responsible for training officers to transport inmates to and from the hospital or other outside trips. Thus, plaintiff does not state a claim for the Superintendent's personal involvement, and the complaint would have been appropriately dismissed against defendant LaClair even if the court had found that there is a question of fact as to whether plaintiff exhausted his administrative remedies.[8]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss and for summary judgment (Dkt. No. 17) be **GRANTED**, and the First Amended Complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE** for failure to exhaust administrative remedies, and it is

**RECOMMENDED**, that in the alternative, the defendants' motion (Dkt. No. 17) be **GRANTED** as to defendant **LaCLAIR**, and the First Amended Complaint be dismissed in its entirety, and without leave to amend, as against defendant LaClair for failure to state a claim, based on a lack of personal involvement.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such

---

[8] Plaintiff has already had one opportunity to amend his complaint. In Senior U.S. District Judge Kahn's initial order in this case, he thoroughly explained the concept of personal involvement and how such a claim may be stated, inviting plaintiff to include such claims in his amended complaint. (Dkt. No. 6 at 9-10). Further amendment may be denied when the plaintiff has already had one opportunity to do so, with prior notice of its deficiencies, and the amended complaint still fails to state a claim. *See Brown v. Montefiore Medical Center*, No. 18 Civ. 3861 (PGG/KHP), 2019 WL 3282927, at *6 (S.D.N.Y. July 22, 2019) (quoting *Blanchard v. Katz*, 705 F. Supp. 1011, 1013-14 (S.D.N.Y. 1989)). Thus, notwithstanding the recommendation of dismissal for failure to state a claim, the dismissal should be without leave to further amend.

objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: August 5, 2020

*[signature]*
Andrew T. Baxter
U.S. Magistrate Judge